## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### WALTERS v. WALTERS.

#### April 13th, 1893.

WILL—*Fraud.*—By his will, made the night before his death, testator devised his three farms to two of his four children for life, remainder to the infant children of one of the two, with whom he lived, disinheriting his two other children—an afflicted son and daughter, with eight helpless children, who had always lived wholly on his bounty. A suit was brought to set aside the will on the ground of fraud. The attesting witnesses testified that the testator did not ask them to sign the will; that they did so at the request of one of the devisees, John, and that they did not believe that the testator saw them sign it, or was competent to make a will. It was also in evidence that John had complete control over his father.

HELD:

    The will should have been set aside.

Appeal from decree of circuit court of Wythe county, rendered at September term, 1891, in the chancery cause wherein James Walters and others were complainants and John Walters and others were defendants. The decree being adverse to complainants, they appealed. Opinion states the case.

*Blair & Blair*, for appellants.

*Holbrook & Thomas*, for appellees.

FAUNTLEROY, J., delivered the opinion of the court.

On the 19th of September, 1888, Wayman Walters, the father of the complainants, James Walters, Nancy Walters, and Stephen Walters, and of the defendant, John Walters

was claimed to have made his last will and testament; and he died on the next day thereafter. This suit was brought by the said James, Nancy, and Stephen Walters against the said John Walters, his wife, and his infant children, to impeach, vacate, and set aside the said alleged will.

The bill was filed at May rules, 1889, and at September term, 1889, a decree was rendered, directing an issue *devisavit vel non*. At the March term, 1891, the guardian *ad litem* of the infant defendants, and the said John Walters *et als.*, defendants, appeared and filed their answers. At the said March term, 1891, there was a trial of the issue *devisavit vel non*, and a verdict thereon in favor of the validity of the will propounded; but the court set the said verdict aside, and ordered a new trial on the said issue, which was had at the September term, 1891, when the jury rendered a verdict finding the writing propounded to be the last will and testament of said Wayman Walters.

The appellants moved the court to set the said verdict aside, as being contrary to the law and the evidence ; which motion the court overruled, and the petitioners took proper bills of exceptions. The said verdict was certified to the chancery side of the court in this cause, and, upon the hearing, the complainants' bill was dismissed.

This case involves the validity of a paper writing, purporting to be the last will and testament of Wayman Walters, deceased, which is dated September 19th, 1888, and which was probated, as such, in the county court of Wythe county, .on the 8th day of October 1888, and which is as follows :

·" I, Wayman Walters, being of sound mind and memory, do ˜make this as my last will and testament :

" 1st. After payment of my just debts, it is my wish that my children herein named, James Madison and his wife, John and his wife, shall have and hold my land for life only ; and

after their death it shall —— to two of John's children, Wayman and Mary Lee, to be held by them in fee simple.

"2d. If John's wife should marry in case of John's death, it is my wish that John's children herein named, Wayman and Mary Lee, shall take the place of their father and mother.

"3d. It is my wish that my son Stephen and my daughter Nancy shall have every year, from the profits of my land, each twenty dollars.

"Lastly. It is my wish that T. F. Dix shall act as my administrator.

his
"WAYMAN ⋈ WALTERS.
mark.

"Witnesses:

> *W. L. Creger,*
> *James P. Patrick.*"

This case is in exact similarity to, and even more grossly revolting than the case of *Tucker* v. *Sandridge, Curator,* 85 Va. (10 Hansbrough), in which Judge Richardson expressed the unanimous opinion of this court, that "the whole scene is, in all its features, too revolting for contemplation, and it would be a criminal mockery of justice and humanity to give it the sanction of judicial toleration."

The paper propounded as the will of Wayman Walters is, upon its face, inofficious, cruel, and inhuman; and gives no reason for the unnatural disposition of the estate of the testator, amounting to over $6,000; disinheriting his afflicted and unfortunate son, Stephen, and his dependent and helpless daughter, Nancy, and her eight children, both of whom lived and were supported by his loving bounty; and giving, virtually, the whole of his estate to his son John for life, with remainder in fee to two of John's infant children; while the circumstances of the procurement or perpetration of the sinister and simulated will, as detailed in the evi-

dence in the record, show a case of gross and systematic imposition upon an aged, dying, and utterly unconscious father, at midnight preceding the day of his death. He had four children—John, James, Nancy, and Stephen. Nancy, his only daughter, with a numerous and helpless family of children, and Stephen, who had been afflicted from his birth, and was especially dear to the old father's heart, all the more because of his physical and mental inability to provide for himself, lived under his protection, wholly on his bounty, waited on him, and nursed and cared for him through all the " evil days " and desolation of his wintry old age, and through the long and hopeless sickness, which ended in his dying all unconscious and innocent of the atrocious injustice by which he had been made to disinherit his own *two* unfortunate and dependent children, and to give his property to two infant grandchildren in remainder, after a life estate to their father, without the assignment, or suggestion, or existence of any reason or cause for so doing.

John Walters, with his wife and children, lived with his father upon one of his three tracts of land, and had the old, feeble man completely and rigidly under his influence and dominion. On the 19th of September, 1888, at midnight of that day, Wayman Walters, over seventy-five years of age, and enfeebled by a sickness which had prostrated him for over a year, lay in a dying stupor, with his face to the wall, unable to turn himself over, or to recognize the members of his own family or his neighbors who had lived close by him and in friendly intercourse for all his lifetime, when John Walters sent for the *scrivener*, who came and wrote the pretended will, giving all three of his father's farms to John and James for life, with remainder in fee to *two* of John's infant children, whose names the old man did not know—disinheriting his favorite son, Stephen, and his daughter, Nancy, and their

numerous and utterly dependent families—without a motive, or a cause, or explanation. The man Fountain, who wrote this paper, had it attested, and carried it away with him, all in *thirty* minutes, during which time he had to lift the dying man and prop him up by a pillow and chair in bed, and stimulate him with whiskey, took the hand of the unconscious man, held him up in bed, put the pen in his hand, and guided it through the mockery of making *his mark* to this so-called will. And this, too, when both of the *attesting witnesses* who were called in to sign the paper—not both together or in each other's presence—and numerous others, who knew his condition well, testify that he was in a dying stupor, had no mind at all, and was not even conscious or capable of recognizing the presence of the scrivener or the attesting witnesses. The man Fountain, in his testimony in support of the will, has photographed his own moral and mental character; and in many essential and material statements made by him he is squarely contradicted by several of the other witnesses for the propounder of the will, and *by himself*. Fountain was almost a stranger to Wayman Walters, and had no means of knowing his mental condition or judging of his testamentary capacity. He says: "I was at Walters' house about one half hour the night the will was written, and then left, and was never inside the house before or since. Decedent did not know the name of his grandchild 'Dolly.' I thought that Dolly was a nick-name, and *suggested* that we call John's wife to know his real name." Yet, having said this on examination-in-chief, on cross-examination Fountain said : " Testator was the person who called some one to go and find out the correct name of 'Dolly.' I am positive that the decedent sent to John's wife that night to know the name of John's child, 'Dolly.'" In his testimony-in-chief he said : "I went into the room and got ready to write the will. I told the old man to tell me how he wanted

his will written." Yet, on cross-examination, Fountain said: "Testator entreated me to write this will, and I intend to stand by it. I have been severely criticised for writing the will; but I wrote the will, and I am going to stand up to it. I am not willing to admit that I can be mistaken about anything. Walters had no unkind feeling towards any of his children that I knew of. I never visited at Walters' house, nor Walters at my house." And, though Creger and Patrick had been very intimate with Walters, (Patrick having slept with him for several weeks previous to his death,) Fountain said "he could judge better the condition of Walters' mind than Creger and Patrick, because he had more sense than they had. Nearly everybody up there had turned against him about the will; and, as he had written the will, he felt anxious for it to stand." He again repeated that he had written the will, and was going to stand up to it; that he felt concerned over the case because he had written the will, and he had been much abused about it, and they had all turned against him on that account, &c. He says: "I saw Mr. Patrick and Mr. Creger subscribe their names; all three were present at the same time; they signed their names in the presence of the testator." Yet Patrick says: "I am quite sure that decedent did not see either Creger or me sign the will; he was too weak to do so, and was not able to see what was going on. Decedent never directed or requested either Creger or me to witness the will; he did not see or recognize either Creger or me; he was in a dying condition at the time; his hands were cold up to his elbows, and his feet were cold, just like he was in a dying condition"; that decedent did not see him, and was not able to do so, as he was too weak to see him, and "lay in the bed unconscious, with his eyes shut and with his face turned towards the wall, and could not turn himself in bed, and I am certain he did not turn his head over, and did not see us. He had been going down hill for some time; he was very old, and had been sick for over a

year, and could not attend to any business at all. John Walters, his son, lived with him, and had great influence over the old man. John Walters asked me to witness the will; and decedent was afraid as death of John Walters and his wife, and he believed they could make him sign any paper they wanted; and he often said he would like to go to see Jim, Stephen, and Nancy, but John fussed with him about going, and he did not go, just to keep peace with John and his wife."

Creger, the other attesting witness, says: "Decedent was in a dying condition at the time Fountain put the pen in his fingers, and took the decedent's hand, put it on the paper, and *made the decedent's mark to the signature.*" Decedent did not recognize either him or Patrick, although he had been intimate with him for fifty years, and Patrick had slept with him for a long time, up to his death; that decedent did not see him or Patrick, and was not able to see them; that he lay in a stupor, with his eyes shut all the time, like a dead man, with his face turned to the wall, away from us, and he could not turn his head towards us without being helped; that he had been sick for over twelve months, and that he was not capable of making a will. Fountain had to stir and shake him to talk to him; and as soon as they quit stirring him up he would drop off, at once, and take no notice of anything around him; and witness does not believe that decedent knew what disposition the paper made of his property, or that he had done so. "John Walters came after me to attest the will, and *I did it for him.* Decedent never directed or requested either me or Patrick to attest the will, nor did he ever sanction it at any time. John Walters lived with his father, and had great control over him"; that "he had no mind of his own, and John could make him do almost anything he pleased." See the case of *Baldwin* v. *Baldwin's Executors,* 81 Va.

These are some of the circumstances of this dying scene, attendant upon the making of this pretended will, as detailed

by the two attesting witnesses who were called in to sign the paper, as such, by John Walters, the procurer and propounder of this so-called will, under which he and his two infant children are the beneficiaries of his father's whole estate, to the exclusion of his father's other children and all his other numerous grandchildren.

In *Tucker* v. *Sandridge, Curator, supra,* and in the cases there cited, it is laid down that the attesting witnesses to a will are bound to detail the attendant circumstances, as affording the only reliable data from which the court can deduce its conclusions. These witnesses were introduced for and by the appellees, or defendants in error; and, without resort to the overwhelming numbers and weight and respectability of the witnesses for the appellants, the testimony of the appellees fully condemns the fraudulent and ill-gotten paper in controversy as invalid and inoperative as the will of Wayman Walters, deceased. But there is no conflict of testimony as to the undue influence of John Walters and his wife over the feeble old father, which procured the making of this false and fraudulent paper, disposing of the entire property of Wayman Walters, and diverting it from its natural line, to the two infant children of John Walters and his wife.

In *Hartman* v. *Strickler and Wife,* 82 Va. (Hansbrough), page 225, Lewis, P., says, for the court, that undue influence depends on the facts in each case, "such as the disposition made by the testator of his property, his situation, and his mental and physical condition when he makes the will," and that where influence induces the testator to make grossly unequal dispositions of his property, or disregard the ties of blood, without sufficient cause, it may be treated as undue.

The uncontradicted testimony in the record shows that John and his wife had complete control and dominion over the superannuated and helpless man. And T. F. Dix, the executor named in the will, refused to qualify under it, because he was satisfied from his own knowledge that the

paper written and procured by Fountain, and propounded by John Walters, was not the will of Wayman Walters, because John Walters controlled his father just as he pleased ; that he did not have any mind of his own ; and that he was sure that Wayman Walters would never have given his property as this paper makes him do, but for the influence and procurement of John Walters.

J. R. Harkrader, the sheriff of Wythe county, says that when he would ask the decedent a question he would turn to John and look to him to answer it ; that John acted for him and spoke for him in everything, and that decedent would say nothing and do nothing without John.

The foregoing testimony, as well as that of numerous other highly respectable neighbors and friends of Wayman Walters, proves conclusively that he had not the capacity to make a will, and that, even if he had, the undue influence of John and his wife dominated him, so as to raise a violent presumption of fraud and imposition, which should be overcome by satisfactory testimony.

We are clearly of opinion that the paper probated and propounded as the last will of Wayman Walters, deceased, is not a valid will ; that it was perpetrated in fraud ; and that the verdict of the jury upon the issue *devisavit vel non* is wrong, and contrary to the law and the evidence ; and that the circuit court erred in refusing to set it aside, and in dismissing the bill of complainants. And this court, proceeding to do what should have been done in the circuit court, will set the verdict aside and enter a decree annulling the probate of the said paper, and declaring it void and of no effect or validity as the will of Wayman Walters, deceased.

The decree of the circuit court appealed from is wholly erroneous, and it is reversed and annulled.

DECREE REVERSED.